Barnett, Judge:
Plaintiff, Hyundai Heavy Industries, Co., Ltd. ("Plaintiff" or "HHI") contests the final results of the U.S. Department of Commerce ("Commerce" or the "agency") in the third administrative review ("AR 3") of the antidumping duty order covering large power transformers ("LPTs") from the Republic of Korea for the period of review August 1, 2014, through July 31, 2015. Large Power Transformers from the Republic of Korea , 82 Fed. Reg. 13,432 (Mar. 13, 2017) (final results of antidumping duty administrative review; 2014-2015) (" Final Results "), ECF No. 17-2, and accompanying Issues and Decision Mem., A-580-867 (Mar. 6, 2017) ("I & D Mem."), ECF No. 17-3.[1]
BACKGROUND
Commerce initiated AR 3 on October 6, 2015. Initiation of Antidumping and Countervailing Duty Admin. Reviews , 80 Fed. Reg. 60,356, 60,358 (Dep't Commerce Oct. 6, 2015), CJA Vol. I Tab 5, PJA Vol. I Tab 5, PR 10, ECF No. 40-1. Commerce selected HHI and Hyosung Corporation as mandatory respondents. I & D Mem. at 3. Commerce issued its initial questionnaire to HHI on December 3, 2015. See Req. for Information - Antidumping Admin. Review (Dec. 3, 2015) ("Initial Questionnaire"), CJA Vol. I Tab 6, PJA Vol. I Tab 6, PR 21, ECF No. 40-1.[2] Commerce published its preliminary results of review on September 2, 2016. Large Power Transformers from the Republic of Korea , 81 Fed. Reg. 60,672 (Dep't Commerce Sept. 2, 2016) (prelim. results of antidumping duty *1335 administrative review; 2014-2015) (" Preliminary Results "). For the Preliminary Results , Commerce relied on HHI's submitted data and calculated a weighted-average dumping margin of 3.09 percent for HHI. Id. , 81 Fed. Reg. at 60,673.
Commerce published the Final Results on March 13, 2017. Final Results , 82 Fed. Reg. 13,432. For the Final Results , Commerce assigned to HHI a final weighted-average dumping margin of 60.81 percent based on total facts available with an adverse inference (referred to as total adverse facts available). Id. , 82 Fed. Reg. at 13,432. Commerce's decision to rely on total adverse facts available was based on four findings: (1) HHI failed to report service-related revenues separately from the gross unit price despite repeated requests from Commerce, I & D Mem. at 21-22; (2) HHI failed to include the price of a subject "part" in the price for certain home-market sales despite repeated opportunities to do so, id. at 23-26; (3) HHI failed to report separately the prices and costs for accessories, id. at 26-27; and, (4) HHI was systematically selective in providing various documents to Commerce and Commerce determined there were discrepancies in HHI's reported data, id. at 27-28.
HHI now challenges Commerce's decision to rely on total adverse facts available and each of the four rationales that the agency cited as supporting that decision. The court must determine whether Commerce's individual findings are supported by substantial evidence and whether the agency's resort to total adverse facts available is otherwise in accordance with law.
JURISDICTION AND STANDARD OF REVIEW
The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii).[3] The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).
LEGAL FRAMEWORK FOR ADVERSE FACTS AVAILABLE
When "necessary information is not available on the record," or an interested party "withholds information" requested by Commerce," "fails to provide" requested information by the submission deadlines, "significantly impedes a proceeding," or provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i), Commerce "shall ... use the facts otherwise available." 19 U.S.C. § 1677e(a). Commerce's authority to use the facts otherwise available is subject to 19 U.S.C. § 1677m(d). Id. Pursuant to § 1677m(d), if Commerce determines that a respondent has not complied with a request for information, it must promptly inform that respondent of the nature of the deficiency and, to the extent practicable in light of statutory deadlines, provide that respondent "an opportunity to remedy or explain the deficiency." Id. § 1677m(d).
Commerce may not disregard information that is "necessary to the determination *1336 but does not meet all the applicable requirements," when:
(1) the information is submitted by the deadline established for its submission,
(2) the information can be verified,
(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
(4) the interested party has demonstrated that it acted to the best of its ability in providing the information ..., and
(5) the information can be used without undue difficulties.
Id. § 1677m(e).
If, however, Commerce determines that the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."Id. § 1677e(b). "Compliance with the 'best of its ability' standard is determined by assessing whether a respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." Nippon Steel Corp. v. United States , 337 F.3d 1373, 1382 (Fed. Cir. 2003).[4]
Commerce uses total adverse facts available when "none of the reported data is reliable or usable," such as when all of the "submitted data exhibit[s] pervasive and persistent deficiencies that cut across all aspects of the data." Zhejiang DunAn Hetian Metal Co. v. United States , 652 F.3d 1333, 1348 (Fed. Cir. 2011) (citing Steel Authority of India, Ltd. v. United States , 25 CIT 482, 487, 149 F.Supp.2d 921, 928-29 (2001) ).
DISCUSSION
I. Service-related revenue
a. Relevant Facts
In Sections B and C of the initial questionnaire, Commerce instructed HHI to "report revenue in separate fields (e.g., ocean freight revenue, inland freight revenue, oil revenue, installation, etc.) and identify the related expense(s) for each revenue." Initial Questionnaire at JA100059. In response, HHI stated:
[HHI] has reported, since the first administrative review, separate revenue and expenses whe[n] the customer issues a separate purchase order for services that are not part of the original term of sale ... [HHI] has reported the sales amount from additional purchase orders in the ADDPOPRU field and the associated additional expenses under the separate purchase order in the ADDPOEXPU field. [HHI] did not receive additional purchase orders for home-market sales during the POR ...."
Resp. of Hyundai Heavy Industries Co., Ltd. to Section B of the Questionnaire (Jan. 27, 2016) ("HHI's Sec. B Resp.") at B-4, CJA Vol. I Tab 8, CR 152-156, PJA Vol. I Tab 8, PR 91-94, ECF No. 40-1; see also Resp. of Hyundai Heavy Industries Co., Ltd. to Section C of the Questionnaire (Jan. 27, 2016) ("HHI's Sec. C Resp.") at C-3, CJA Vol. I Tab 9, CR 152-156, PJA Vol. I Tab 9, PR 91-94, ECF No. 40-1 (cross-referencing its response to Section B of the questionnaire). HHI explained that its reporting methodology was based on Commerce's "conclusion" in the original investigation:
*1337 [Commerce] found that [HHI] correctly had reported its gross unit price and properly did not separate, for example, freight where there were no 'separate arrangements on behalf of the customer' and where [HHI] had not 'sought reimbursement for that cost.' ... [Commerce] recognized that its practice is to separate revenue and expenses 'that are not included in the term of sale.'
HHI's Sec. B Resp. at B-3 (citing Issues and Decision Mem., A-580-867 (Jul. 11, 2012) ("Initial Investigation I & D Mem.") at Comment 4, accompanying Large Power Transformers from the Republic of Korea , 77 Fed. Reg. 40,857 (Dep't Commerce July 11, 2012) (final determination of sales at less than fair value). HHI reasoned that the prices of its services are not separable from the price of the subject merchandise. See id. at B-4 ("[W]he[n] it is required, installation and supervision are not separable from the LPT itself."). HHI's response asserted that Commerce has distinguished "separately provided and charged services from those within the terms of sale" in prior proceedings. Id. at B-3 (citing Issues and Decision Mem., A-100-001 (Aug. 31, 2009) at Comment 12, accompanying Ball Bearings and Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom , 74 Fed. Reg. 44,819 (Dep't Commerce Aug. 31, 2009) (final results of antidumping duty admin. reviews and revocation of an order in part).
Following this initial response, Commerce asked HHI to "clarify whether HHI or Hyundai USA received revenue related to international freight, inland freight, oil, installation, or any other expenses on U.S. sales. If so, please report this revenue in a field separate from the related expense." Suppl. Questionnaire for Hyundai Heavy Industries Co., Ltd., and Hyundai Corp. USA's Questionnaire Resps. (July 27, 2016) ("July 27, 2016 Suppl. Questionnaire") at 7, CJA Vol. I Tab 13, CR 266, PJA Vol. I Tab 13, PR 169, ECF No. 40-1. HHI responded in two parts. In the first part, HHI stated: "In accordance with [Commerce's] review and treatment of [HHI's] sales documentation in prior segments of this proceeding, [HHI] did not receive separate revenue related to international freight, inland freight, oil, installation, or any other expenses on home-market sales or U.S. sales." See Resp. to the Second Suppl. Sections A, B, C and D Questionnaire (Aug. 10, 2016) ("HHI's Aug. 10, 2016 Suppl. Resp."), at 11, CJA Vol. I Tab 14, CR 299-313, PJA Vol. I Tab 14, PR 179-179, ECF No. 40-1. HHI further indicated that it reported its service revenues in accordance with Commerce's conclusions in prior reviews. See id. at 11-12 ("In those instances whe[n HHI] received a purchase order for a separate service, [HHI] reported the sales revenue and corresponding expenses separately in accordance with [Commerce's] requirements[.]").
In the second part of its response, HHI included Attachment 2S-17, which Commerce found to be relevant to HHI's revenue reporting. See Resp. to Questions 8, 16, 25, 26 and 28 of the Second Suppl. Sections A, B, C and D Questionnaire (Aug. 18, 2016) ("HHI's Aug. 18, 2016 Suppl. Resp."), Attach 2S-17, CJA Vol. I Tab 15, CR 300-313, PJA Vol. I Tab 15, PR 189-190, ECF No. 40-1. Attachment 2S-17 included sales documentation that contained separate service line-items with a corresponding price, and those price amounts were higher than the expenses that HHI reported in its sales database. See I & D Mem. at 20 & nn.105-106 (citing HHI's Aug. 18, 2016 Suppl. Resp., Attach 2S-17; HHI's Aug. 18, 2016 Suppl. Resp., Attach 2S-26, CJA Vol. VI Tab 4, CR 299-315, PJA Vol. II Tab 4, PR 189-190, ECF No. 46-1).
*1338 Commerce sent a second supplemental questionnaire to HHI after it issued the Preliminary Results. See Suppl. Questionnaire for Hyundai Heavy Industries Co., Ltd., and Hyundai Corp. USA's Questionnaire Resps. (Oct. 7, 2016) ("Oct. 7, 2016 Suppl. Questionnaire"), CJA Vol. I Tab 16, CR 346, PJA Vol. I Tab 16, PR 213, ECF No. 40-1. Therein, Commerce cited ABB Inc.'s ("ABB") argument that HHI had received service-related revenue, and instructed HHI to report such expenses and revenues:
"In its September 13, 2016 comments, Petitioner asserts [that] HHI incurred expenses and obtained revenues for separately-negotiated services and non-subject merchandise for [certain][5 ] sales.... Please revise your U.S. sales database to report all such expenses and revenues for these sales in separate fields."
Id. at 6. Commerce also stated: "If, in your opinion, there were no additional expenses or revenues related to a sale, please comment on each of the items cited by the Petitioner ...." Id. at 6.
In its response, HHI addressed the particular sales rather than revising the sales database. See HHI's Nov. 10, 2016 Suppl. Resp. at 7-8, 11-16. Relevant to the service-related revenue issue, HHI explained that although there were separate line item values for certain services, those values were "not severable from the lump-sum price." Id. at 7-8.[6] HHI went on to state that, notwithstanding its "demonstration [ ] that HHI did not have any 'separate' revenues for separate services or non-subject merchandise," HHI was providing "a worksheet listing on a category basis the values listed anywhere in the sales documentation for the breakdowns of the price of the LPTs and the corresponding expenses." Id. at 23; see also id. , Attach. 3S-46 (the worksheet), CJA Vol. IV Tab 17, PJA Vol. I Tab 17, ECF No. 43-1.
In its Final Results , Commerce determined that HHI refused to provide information requested in the initial and supplemental questionnaires, and therefore, "impeded [the] review by failing to act to the best of its ability by failing to provide [Commerce] with the requested information in a timely manner." I & D Mem. at 22. Commerce's review of HHI's sales documents identified separate service line items with corresponding prices, which were higher than HHI's corresponding reported expenses, supporting Commerce's concern that HHI could be overstating gross unit prices. Id. at 20, 21. Commerce concluded that, "HHI and its customers separately assigned prices for the related services and identified these amounts as separate line items on invoices, separate from the price of the subject merchandise." Id. at 21. Moreover, Commerce stated:
Although these services are required under the terms of sale and are invoiced on a lump-sum basis, as [HHI] argued, we find that [HHI's] sales documentation specifically indicates that these sales-related services could be negotiable, apart from subject merchandise, since each service is shown/listed with the corresponding amount in purchase orders *1339 and/or invoices. In other words, if customers do not like [HHI]'s price for a certain service, they can procure/arrange such service on their own without using [HHI]'s service.
Id. at 21. Commerce questioned the reliability of the worksheet provided by HHI, finding it incomplete because it appeared to be missing certain data fields for multiple U.S. sales, such as the related expenses for its claimed revenues. Id. According to Commerce, if HHI had "followed [Commerce's] request to report separately service-related revenues and the related expenses early on ... [the agency] would have had the time to request additional necessary information (i.e., the missing data) and verify other issues." Id. at 22. Commerce also explained that it had "specifically requested that [HHI] provide this information in the instant review, because [HHI's] sales documentation identifies separate line items for sales-related services." Id. Those separate line items demonstrated to the agency that the sales-related services could be negotiable, thereby distinguishing this review from prior segments of this proceeding. See id.
b. Parties' Contentions
Plaintiff asserts that Commerce departed from the practice it relied upon in previous segments of the proceeding for determining whether separate service-related revenue existed or should have been reported. See Confidential Rule 56.2 Mot. for J. Upon the Agency R. on Behalf of Pl. Hyundai Heavy Industries Co. Ltd. and Mem. of P. & A. in Supp. ("Pl.'s Br.") at 24-26, ECF No. 26 (referring to Commerce's application of a "new test"). Plaintiff contends that in so doing, Commerce failed to provide Plaintiff sufficient notice of its change in practice. See id. at 24, 29-31. Plaintiff further contends that Commerce did not indicate in the supplemental questionnaires that the agency was changing its approach to service-related revenue or identify a deficiency in HHI's data. Confidential Am. Reply in Supp. of Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. ("Pl.'s Reply") at 6-7, ECF No. 38. HHI also argues that the worksheet submitted with its third response provided the information necessary to calculate a dumping margin. See Pl.'s Br. at 31-33.
United States ("Defendant" or the "Government") defends Commerce's determination on the grounds that "each administrative review is a separate segment of [the] proceeding[ ] with its own unique facts." Confidential Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. ("Def.'s Resp.") at 16, ECF No. 31 (quoting Shandong Huarong Mach. Co. v. United States , 29 CIT 484, 491, 2005 WL 1105110 (2005) ). According to the Government, Commerce based its revenue-capping decision in each segment on the record evidence presented in that individual segment. See id. at 17. Thus, notwithstanding the agency's conclusions in prior administrative segments, Commerce reasonably concluded, based on evidence presented in AR 3, that HHI separately negotiated the price for service-related expenses. See id. at 18.
ABB argues that Commerce modified its standard antidumping duty questionnaire at the beginning of the review, instructing HHI to separately report its service-related revenue. Confidential Def.-Int.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("ABB's Resp.") at 6-7, ECF No. 29. ABB contends that Commerce's instruction in the supplemental questionnaire "did not limit reporting of revenues in this review regardless of what it may have done in the prior segments." Id. at 8. ABB characterizes Plaintiff's arguments concerning Commerce's alleged use of a new service-related revenue methodology as a *1340 challenge to Commerce's fact-finding authority. See id. at 22 ("Contrary to HHI's claim, Commerce's right to seek factual information during a proceeding does not constitute a 'test' from which the agency must justify a departure.").
c. Analysis
Antidumping analysis requires Commerce to compare the export price or constructed export price of the subject merchandise with the normal value of the foreign like product. See 19 U.S.C. § 1677b(a) ; see also 19 C.F.R. § 351.401(a). Section 1677a(c) provides three instances when Commerce shall increase the export price or constructed export price, and § 1677b(a)(6) provides six instances when Commerce shall increase the normal value. See 19 U.S.C §§ 1677a(c), 1677b(a)(6). There is no statutory basis for increasing the export price, constructed export price, or normal value when a service is separately provided and the respondent earns a profit on the provision of that service. See Sucocitrico Cutrale Ltda. v. United States , Slip Op. 12-71, 2012 WL 2317764, at *4 (CIT June 1, 2012) ("Commerce properly determined that it was inappropriate to treat the [service charges] as adjustments to the U.S. price under section 1677a(c)" when those charges were not attributable to the subject merchandise.) Likewise, there is no statutory language requiring export price, constructed export price, or normal value to be adjusted downward for any profit made on the provision of a service when the provision of that service is part of the transaction for the sale of the subject merchandise. See 19 U.S.C §§ 1677a(c) - (d), 1677b(1)(6)-(7). Thus, the issue, as framed by Commerce, is whether the gross unit price, as reported by HHI, properly includes the provision of the services in question or, as determined by Commerce, those services were separately negotiable, regardless of whether they were ultimately provided and charged in a single, lump-sum invoice. See I & D Mem. at 21 ("[HHI's] sales documentation specifically indicate[d] that these sales-related services could be negotiable, apart from subject merchandise since each service is shown/listed with the corresponding amount in purchase orders and/or invoices.").
When Commerce finds that a service is separately negotiable, its practice has been to cap the service-related revenue by the associated expenses when determining the U.S. price. Id. at 18 & n.88 (citations omitted). This court recently acknowledged that Commerce's revenue-capping practice was previously examined by the court and found to be reasonable. See ABB, Inc. v. United States , 41 CIT ----, ----, 273 F.Supp.3d 1200, 1208-09 (2017) (citing Dongguan Sunrise Furniture Co., Ltd. v. United States , 36 CIT ----, ----, 865 F.Supp.2d 1216, 1248 (2012) ). Plaintiff does not challenge Commerce's capping practice, instead focusing its arguments on the agency's factual findings. See Pl.'s Br. at 25-31; Pl.'s Reply at 2-6.
Substantial evidence supports Commerce's finding that HHI had separate service-related revenue to report, but failed to do so. See I & D Mem. at 21. Although HHI did not issue separate invoices for these services, the record shows that "HHI and its customers separately assigned prices for these services and identified these amounts as separate line items on invoices, separate from the price of the [LPTs]." I & D Mem. at 21 & n.112 (citing HHI's Nov. 10, 2016 Suppl. Resp., Attach. 3S-35);[7] see also id. at 20 & n.105 *1341 (citing HHI's Aug. 18, 2016 Suppl. Resp., Attach. 2S-17); Pl.'s Br. at 10 (asserting that "its sale documents sometimes showed separate prices for services") (citations omitted).
Moreover, Commerce's determination that HHI withheld information requested by the agency and significantly impeded the proceeding is supported by substantial evidence. See I & D Mem. at 4-5, 21-22. Commerce's initial questionnaire instructed HHI to report service-related revenue in separate fields and to identify the related expense for each type of revenue. Initial Questionnaire at JA100059. HHI did not report all separately identifiable revenues as requested, instead reporting separate revenue and expenses only for services when the customer issued a separate purchase order because they were not encompassed in the original terms of sale. See HHI's Sec. B Resp. at B-3; HHI's Sec. C Resp. at C-3. When Commerce requested Plaintiff to clarify whether HHI or its U.S. affiliate received revenue related to freight, oil, installation, or other related expenses on U.S. sales, and, if so, to report this revenue in a separate field along with the related expense, HHI again responded by providing its understanding of the terms "separate revenue." See July 27, 2016 Suppl. Questionnaire at 7; HHI's Aug. 10, 2016 Suppl. Resp. at 11-12. When Commerce asked Plaintiff in the subsequent supplemental questionnaire to revise its U.S. sales database to report expenses and revenues in separate fields, addressing ABB's assertions of separately-negotiated services, Plaintiff did not revise its database but rather provided a worksheet purporting to list a breakdown of "the values listed anywhere in the sales documentation" and the corresponding expenses. See Oct. 7, 2016 Suppl. Questionnaire at 6; HHI's Nov. 10, 2016 Suppl. Resp. at 23.
Thus, Commerce asked HHI on three separate occasions to separately report service-related revenue. Twice, HHI did not; and the third time, HHI provided a worksheet which was not responsive in the form or manner requested by Commerce. "The focus of [ 19 U.S.C. 1677e ](a) is respondent's failure to provide information.... The mere failure of a respondent to furnish requested information-for any reason-requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination." Nippon Steel , 337 F.3d at 1381 (emphasis omitted).
The court must next consider whether Commerce met its obligations, pursuant to 19 U.S.C. § 1677m(d), to notify HHI of deficiencies in its questionnaire responses. Plaintiff's arguments that Commerce did not provide HHI with sufficiently detailed notice of deficiencies in its reporting are not persuasive. See Pl.'s Br. at 22-23, 32-33. HHI was informed that its reporting of service-related revenue was deficient because Commerce made multiple requests for such information, including an explicit request that HHI revise its sales database to report "all expenses and revenues" in separate fields.[8] Intentional *1342 obtuseness on the part of respondent does not obviate Commerce's multiple requests to HHI for the relevant information.
Substantial evidence also supports Commerce's decision to apply an adverse inference, which was otherwise in accordance with law. Commerce "may use an inference that is adverse to the interests of [a respondent] in selecting from among the facts otherwise available" when the respondent "fail[s] to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1)(A). A respondent fails to cooperate by acting to the best of its ability to comply with a request for information when it has not "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." Nippon Steel , 337 F.3d at 1382.
As noted, Commerce made multiple requests for HHI's service-related revenue, and each time HHI explained that its reporting relied on prior segments of the proceeding rather than providing the information specific to the current review period as requested by Commerce. The fact that the records of prior segments did not support a conclusion that certain service-related revenues were separately reportable does not excuse HHI from the burden of again establishing, on the record of this review, that such revenues were not separately reportable. As evidenced by the worksheet that HHI ultimately provided, HHI had the ability to provide substantially more information than it initially did, but withheld that information until very late in the review.
HHI argues that its failure to comply with the supplemental questionnaires was informed by, and should be excused by, Commerce's treatment of its service-related revenues in the original investigation and prior reviews of LPTs. See Pl.'s Br. at 25-26 (citing Initial Investigation I & D Mem. at 29; Issues and Decision Mem., A-580-867 (Mar. 8, 2016) ("AR 2 I & D Mem.") at 39-40, accompanying Large Power Transformers from the Republic of Korea , 81 Fed. Reg. 14,087 (Dep't Commerce Mar. 16, 2016) (final results of antidumping duty admin. review; 2013-2014). HHI may not, however, rely on Commerce's factual conclusions from prior reviews in the instant review because each review is separate and based on the record developed before the agency in the review. See, e.g. , Jiaxing Bro. Fastener Co., Ltd. v. United States , 822 F.3d 1289, 1299 (Fed. Cir. 2016) ; Shandong Huarong Mach. Co. v. United States , 29 CIT 484, 491, 2005 WL 1105110 (2005) ("[A]s Commerce points out, 'each administrative review is a separate segment of [the] proceeding[ ] with its own unique facts. Indeed, if the facts remained the same from period to period, there would be no need for administrative reviews.' ") (citation omitted).
In prior segments of the LPTs from Korea proceeding, Commerce made clear that its conclusions were based on the record of each segment. See HHI's Aug. 10, 2016 Suppl. Resp. at 11-13 (citing Initial Investigation I & D Mem.; AR 2 I & D Mem.). Tellingly, on three occasions, HHI quoted language from the prior review and the original investigation, indicating that Commerce's results were "[b]ased on the record of the current review," "based upon its review of record evidence," or based on what "the record ... suggest[ed]." Id. at 11-13. The burden to build the record in each segment lies with the respondent. See Ta Chen Stainless Steel Pipe, Inc. v. United States , 298 F.3d 1330, 1336 (Fed. Cir. 2002) ("The burden of production [belongs] to the party in possession of the necessary information.") (quoting Zenith Elecs. Corp. v. United States, 988 F.2d 1573, 1583 (Fed. Cir. 1993) (alteration in original).
*1343 Substantial evidence further supports a finding that HHI's worksheet failed to satisfy the elements of 19 U.S.C. § 1677m(e). As already noted, HHI did not provide the worksheet allegedly containing the service-related revenue until after the Preliminary Results were issued. See HHI's Nov. 10, 2016 Suppl. Resp. at 23; see also id. , Attach. 3S-46 (the worksheet). At that point, Commerce determined that it could not verify the worksheet's information and address various other issues concerning the worksheet at such a late stage of the review. See I & D Mem. at 22 & n.15 (citing Petitioner's Case Br. (Jan. 5, 2017) at 20-22, CJA Vol. VI Tab 9, CR 463-65, PR 280-281, ECF No. 46-1). Further, Commerce also noted that the worksheet was "incomplete" in that it was "missing information for multiple U.S. sales," casting "serious doubt on the reliability of such information." Id. at 21. These findings are confirmed by the worksheet itself. See HHI's Nov. 10, 2016 Suppl. Resp., Attach. 3S-46. Thus, substantial evidence supports Commerce's finding that HHI failed to satisfy the elements of 19 U.S.C. § 1677m(e).
For the foregoing reasons, Commerce's findings that HHI had service-related revenues, and that HHI failed to report service-related revenues separately from the gross unit price despite repeated requests from Commerce, are supported by substantial evidence.
II. HHI's Treatment of a Certain LPT "Part"
a. Relevant Facts
The scope of the antidumping duty order covers both complete and incomplete LPTs. In its initial questionnaire, Commerce repeated the text of the scope, including the definition of incomplete LPTs as "subassemblies consisting of the active part and any other parts attached to, imported with or invoiced with the active parts of LPTs." Initial Questionnaire at JA100062. Commerce instructed Plaintiff to "report the price and cost for 'spare parts' and 'accessories' to ensure that product matches are based on accurate physical characteristics of the LPTs." See Resp. of HHI to Section D of the Questionnaire (Feb. 5, 2016) ("HHI's Sec. D Resp.") at D-2, CJA Vol. V Tab 22, CR 163-69, PJA Vol. I Tab 22, PR 97, ECF No. 45-1. Commerce found that despite the agency's clear instructions, HHI failed to report correctly its home-market price because it excluded a certain part from the home-market gross unit price, thereby understating normal value. See I & D Mem. at 23-25.
In a supplemental questionnaire, Commerce instructed HHI to provide complete sales documentation and all sales related documentation for two home-market sales.[9] July 27, 2016 Suppl. Questionnaire at 5. The documentation that Plaintiff submitted in response indicated that HHI "incorrectly identified a certain part required to assemble a complete LPT as non-foreign like product." I & D Mem. at 24 & n.123 (citing HHI's Aug. 18, 2016 Suppl. Resp. at 1-3 & Attach. 2S-17).[10]
Commerce issued a second supplemental questionnaire, requesting documents supporting HHI's sales negotiation process and all expenses concerning these same *1344 home-market sales. Oct. 7, 2016 Suppl. Questionnaire at 5. Hyundai again reported the same part as non-subject merchandise. See Resp. to the Third Suppl. Sections A, B, C, and D Questionnaire (Oct. 27, 2016), Attach. 3S-7 at JA 300104-JA 300106, CJA Vol. VI Tab 7, CR 347-71, PJA Vol. II Tab 7, PR 225-27, ECF No. 46-1.
In December 2016, ABB raised the issue of HHI's failure to include the part in the home-market gross unit price in comments to the agency. See ABB's Dec. 2, 2016 Cmts at 10-13. In its response to these comments, HHI failed to address this issue; instead, it waited to raise the issue in its case brief. See Def.'s Resp. at 22; Pl.'s Br. at 13. In its case brief, HHI then argued:
At this stage of this review, [HHI] is not permitted to submit rebuttal information to respond to ABB's argument and is limited to documents on record. With this limitation, the record is ambiguous and does not allow a definitive conclusion regarding whether the items in question are properly included in the gross unit price.
Pl.'s Br. at 13 (quoting HHI Admin. Case Br. (Jan. 5, 2017) at 21, CJA Vol. V Tab 19, CR 462, PJA Vol I Tab 19, PR 279, ECF. No. 45-1). Hyundai proffered a "revised price calculation worksheet" that allegedly included the excluded part with increased gross unit prices for the sales in question. Pl.'s Br. at 13; HHI Admin. Case Br. at 21 & Ex. 2.
Commerce concluded that the excluded part was "required to assemble a complete LPT," and that Hyundai had incorrectly labeled the part as non-subject merchandise in its first and second supplemental questionnaire responses. I & D Mem. at 25. The agency noted while HHI excluded the part from the gross unit prices for the home market sales, it included the same part in the gross unit prices for the U.S. sales, rendering the two prices incomparable. Id. Because this issue impacted the vast majority of home market sales for which the agency had examined full documentation, Commerce found that the improper reporting called into question all of the home market sales reporting and, thus, found all of HHI's home market prices unreliable. Id. at 26.
b. Parties' Contentions
At the outset, Plaintiff does not specifically challenge Commerce's factual finding that that the excluded part was subject merchandise and Plaintiff failed to correctly report it as such. See Pl.'s Br. at 34-35. Instead, Plaintiff argues that the sales documentation and revised calculation it provided to the agency as part of its administrative case brief contained all the information necessary to calculate home market prices for the LPTs, inclusive of the part. See Pl.'s Br. at 34.[11] Plaintiff avers that "[Commerce] had no grounds to use [facts available]" under these circumstances. Pl.'s Br. at 34.
Defendant argues that HHI's failure to include the particular part in its home-market gross unit price "undermined Commerce's ability to analyze [HHI]'s information" and "Commerce reasonably determined that Hyundai failed to act to the best of its ability to provide necessary requested information." Def.'s Resp. at 19-20. ABB argues that HHI is attempting to shift the record-building burden to Commerce by "claiming that this issue did not arise until late in the proceeding such that HHI was deprived of the chance to remedy its misreporting," when the burden to build the record is on the respondent. ABB's Resp. at 36-37.
*1345 c. Analysis
Commerce's finding that HHI's failure to report properly its home market sales, inclusive of the price of within-scope parts, warrants the use of adverse facts available is supported by substantial evidence.
First, as noted, Plaintiff does not directly challenge Commerce's factual finding that Plaintiff withheld information, such as the proper reporting of the part in question. Second, Commerce identified the problem with HHI's reporting while in the process of reviewing Plaintiff's response to the second supplemental questionnaire, I & D Mem. at 24, and HHI acknowledged that this issue was identified at "a very late stage of the review process," id. Plaintiff does not argue that Commerce should have provided it an opportunity to remedy its defect, but argues that Commence should have utilized the revised calculation worksheet that HHI submitted in its administrative case brief. See Pl.'s Br. at 34. Alternatively, Plaintiff argues that Commerce had the necessary documentation to calculate the prices inclusive of the part. Id. This argument requires the court to assess whether substantial evidence supports a finding that HHI failed to satisfy the elements of 19 U.S.C. § 1677m(e) regarding the use of certain information.
Commerce declined to rely on the revised calculated worksheet because it "did not have time to confirm or verify the validity of these revisions." I & D Mem. at 25 (discussing in detail the agency's concerns with HHI's reporting and providing specific examples of why it questioned the reliability of HHI's reported home market prices). As discussed above, § 1677m(e) precludes Commerce from disregarding information that is "necessary to the determination" when five criteria are satisfied. 19 U.S.C. § 1677m(e). Having articulated its reasons for why it could not verify the accuracy of this data, 19 U.S.C. § 1677m(e) did not preclude Commerce from disregarding this data.
Finally, the court must assess whether Commerce's analysis of HHI's misreporting of this part supports its determination to draw an adverse inference pursuant to 19 U.S.C. § 1677e(b). " 'Compliance with the 'best of its ability standard ... requires that importers ... have familiarity with all of the records ... [in their] possession, custody, or control," and that they "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so." Nippon Steel Corp. , 337 F.3d at 1382. Here, the court cannot find fault with the agency's conclusion that this issue supports the use of an adverse inference. Record evidence indicates that Plaintiff understood it was required to report the gross unit price to reflect any parts necessary to assemble an incomplete LPT. As Commerce noted, the same part that Plaintiff reported as non-subject merchandise in its home-market sales database was also sold in the United States and properly reported as subject merchandise in the U.S. sales database. See I & D Mem. at 25 & n.134 (citing HHI's Nov. 10, 2016 Suppl. Resp., Attach. 3S-35). At no point in its briefing to the court, including in its reply brief after Defendant and Defendant-Intervenor raised this issue, did Plaintiff acknowledge or address this contradictory treatment of the part in question. See Def.'s Resp. at 24; ABB's Resp. at 36. On this record, it is clear that HHI failed to act to the best of its ability in properly reporting sales of this part.
III. Accessories
a. Relevant Facts
As previously noted, Commerce instructed HHI to "separately report the price *1346 and cost for 'spare parts' and 'accessories' to ensure that product matches are based on accurate physical characteristics of the LPTs." HHI's Sec. D Resp. at D-2. Commerce, however, did not define what it meant by "accessories." See id. In its response, HHI reported the price and cost for "spare parts," that is, "parts that are not needed to assemble an incomplete [LPT,] and noted that "there is no definition of what constitutes 'accessories.' " Id. HHI further stated that components attached to the active part of the LPT are defined as included within the subject merchandise; therefore, it reported the price and cost of those components inclusive with the LPT. Id. at D-2-D-3.
Commerce sent a supplemental questionnaire requesting HHI to "confirm that [its] product-specific costs do not include the costs for spare parts and accessories (i.e., non-subject merchandise)." See Resp. to the Third Suppl. Sections A, B, C, and D Questionnaire (Oct. 27, 2016) ("HHI's Oct. 27, 2016 Suppl. Resp.") at 22, CJA Vol. V Tab 24, CR 349-67, PR 225-27, ECF No. 45-1. In its response, HHI "confirm[ed] that the product-specific costs reported in the cost database do not include costs for non-subject merchandise." Id. In the Final Results , Commerce concluded that "[HHI] withheld necessary information that was specifically requested" with respect to "accessories." I & D Mem. at 27. It reasoned that if HHI "had questions related to the definition of 'accessories,' it could have contacted the [agency] to request clarification." Id. Moreover, it found that record evidence, to wit, sales documentation, contradicted HHI's assertion that it was unaware of the definition of accessories "because sales documentation provided by [HHI] indicates that the industry uses such term and that term is referred to in certain documents provided by [HHI]." Id. at 27 & n.139 (citing HHI's Nov. 10, 2016 Resp., Attach. 3S-35).
b. Parties' Contentions
Plaintiff argues that Commerce was responsible for defining "accessories," Pl.'s Br. at 38, and states that the documents referenced by the agency did not consistently treat particular products as "accessories," which "demonstrates [HHI's] quandary and why [Commerce] needed to define 'accessories,' " Pl.'s Reply at 17. Plaintiff also argues that the agency failed to comply with 19 U.S.C. § 1677m(d) ; that is, to notify HHI of the deficiency and provide it an opportunity to cure the deficiency. See Pl.'s Reply at 15-16. Defendant and ABB argue that Commerce did not have the burden to define "accessories" because the burden to build the record is on the respondent; HHI did not request clarification regarding the definition of "accessories"; and HHI knew the definition of "accessories" because its sales documentation uses the term. See Def.'s Resp. at 27; ABB's Resp. at 40.
c. Analysis
Commerce's conclusion that "[HHI] withheld necessary information that was specifically requested" with respect to "accessories[,]" I & D Mem. at 27, is unsupported by substantial evidence. Commerce asserted that it instructed HHI to separately report accessories, and HHI failed to do so. See I & D Mem. at 26-27; see also Def.'s Resp. at 26-27. However, Commerce did not find that any of HHI's components should have been reported as accessories. See I & D Mem. at 26-27. Plaintiff asserted that "all of its 'accessories' are in the scope by definition, and, thus properly included in subject merchandise[.]" Id. at 26. Commerce made no finding that Plaintiff's assertion was incorrect. Id. at 26-27. Rather, it appears that the agency faulted HHI simply for asserting that it was unaware of how Commerce *1347 defined accessories (because Commerce never provided guidance on this definition), rather than for failure to correctly report accessories. Specifically, Commerce stated:
[R]ecord evidence contradicts [HHI's] assertion that [HHI] has been unaware of the definition of accessories. Specifically, at minimum, [HHI] is aware of what constitutes an accessory, because sales documentation provided by [HHI] indicates that the industry uses such term and that term is referred to in certain documents provided by [HHI].
Id. at 27 & n.139 (citing HHI's Nov. 10, 2016 Suppl. Resp., Attach. 3S-35). Commerce never made a factual finding that any "accessories" referenced in such sales documentation were non-subject merchandise that should have been separately reported as accessories. Id. at 26-27.
HHI addressed its concerns regarding a lack of definition for accessories in written submissions before and after Commerce issued the questionnaires requesting this data. See Resp. to Petitioner's Comments on Antidumping Questionnaires (Nov. 20, 2015) at 3-4, CJA Vol. V, Tab 21, PJA Vol. V Tab 21, PR 19, ECF No. 45-1; Rebuttal Br. of Hyundai Heavy Industries Co., Ltd. (Jan. 11, 2017) at 66, CJA Vol. V, Tab 25, CR 469, PJA Vol. I Tab 25, PR 288, ECF No. 45-1 (arguing that "[b]y definition, [accessories] are subject merchandise and properly included in the transformer" and that "ABB has not demonstrated that any of the "accessories" of which it complains is not attached to, has a function in, or is integral to the transformer"). Additionally, documentation on record shows that there has not been consistent identification of "accessories," which supports the need for guidance on the term's meaning. See Pl.'s Reply at 17.[12] Without guidance from Commerce regarding the definition of "accessories," HHI's interpretation of the term as excluding transformer parts that physically attach to an LPT was reasonable and otherwise appears to comport with the scope of the order and with Commerce's instructions. See Initial Questionnaire at JA100062 (defining the scope of subject merchandise as "consisting of the active part and any other parts attached to, imported with or invoiced with the active parts of LPTs"); HHI's Oct. 27, 2016 Suppl. Resp. at 22 ("[C]onfirm that your product-specific costs do not include the costs for spare parts and accessories (i.e., non-subject merchandise).").
ABB argues that "Commerce was not in a position to define accessories as the term applies to HHI's sales without HHI providing information on how that term was used [with its customers]" and that "it was incumbent on HHI in the first instance to notify Commerce of its commercial practice regarding the treatment of accessories." ABB's Resp. at 40 (first alteration in original). However, Commerce did not communicate to HHI that its commercial literature should be the basis of the "accessories" definition. The only *1348 guidance Commerce provided to HHI regarding the definition was in the scope of the order and when Commerce compared "accessories" to non-subject merchandise in the second supplemental questionnaire. "If Commerce is to take an action adverse to a party for an alleged failure to comply with an information request, it must fulfill its own responsibility to communicate its intent in that request." Prosperity Tieh Enter. Co. v. United States , 42 CIT ----, 284 F.Supp.3d 1364, 1381 (2018).
For the foregoing reasons, Commerce's conclusion that "[HHI] withheld necessary information that was specifically requested" with respect to "accessories" is unsupported by substantial evidence.
IV. Selective Reporting and Other Discrepancies
a. Relevant Facts
In October 2016, Commerce instructed Hyundai to "provide complete sales and expenses documentation (including all sales and expenses related documentation generated in the sales process) for all U.S. [sales]." Oct. 7, 2016 Suppl. Questionnaire at 5 (emphasis omitted). Hyundai responded by providing, inter alia , an attachment comprised of over 3,300 pages of sales information. See HHI's Nov. 10, 2016 Suppl. Resp., Attach. 3S-35; supra note 7
In the Final Results , Commerce determined that HHI selectively reported information in response to Commerce's October 2016 request, and that there were other discrepancies with this submission that further supported use of adverse facts available. See I & D Mem. at 27-28. Commerce found that HHI impeded the review and frustrated the agency's ability to "satisfy [itself] that the data provided are accurate and reliable." I & D Mem. at 27. As an example of HHI's selective reporting, Commerce stated it was missing invoices for certain expenses despite its instruction to HHI "to submit all related documents." I & D Mem. at 28. Commerce also identified discrepancies in freight and marine insurance values reported to U.S. Customs and Border Protection and to Commerce, brokerage expense issues, and an incorrect allocation of installation costs. See I & D Mem. at 28.
b. Parties' Contentions
Plaintiff argues that Commerce's determination lacks specific explanation to support its findings that HHI selectively reported information and that there were discrepancies in the information that HHI provided. See Pl.'s Br. at 39-40. Plaintiff also asserts that Commerce's "request for all U.S. sales and expense documents late in the case was procedurally unfair" because it "denied [HHI] an opportunity to clarify data by prohibiting the submission of new facts." Id. at 40-41. Defendant contends that HHI failed to cooperate to the best of its ability because it did not comply with Commerce's request for complete sales and expense documentation, namely, by failing to provide invoices. See Def.'s Resp. at 30-31. Defendant further contends that HHI could not rely on Commerce's acceptance of information in the Preliminary Results when Commerce requested additional supporting information after the Preliminary Results. Id. at 31. ABB avers that Commerce did identify specific deficiencies in the Final Results , and Commerce's findings are supported by substantial evidence. See ABB's Resp. at 42-43 (citing I & D Mem. at 27-28). According to ABB, HHI's selective reporting and discrepancies in its data amounts to "willful behavior that does not meet the 'maximum effort' standard set in Nippon Steel . " Id. at 43 (citing Nippon Steel, 337 F.3d at 1382 ).
c. Analysis
Commerce's determination that Hyundai impeded the review by selectively *1349 reporting incomplete and unreliable documentation to Commerce is unsupported by substantial evidence. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Huaiyin Foreign Trade Corp. v. United States , 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB , 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) ). To be supported by substantial evidence, Commerce must explain the basis for its decisions sufficiently to make its decisions reasonably discernable to a reviewing court. NMB Singapore Ltd. v. United States , 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citing NSK Ltd. v. United States , 481 F.3d 1355, 1359 (Fed. Cir. 2007) ).
Commerce's discussion of HHI's selective reporting and data discrepancies lacks record citations supporting the agency's findings. See I & D Mem. at 27-28 & nn.140-41 (citing only the Oct. 7, 2016 Suppl. Questionnaire at 5-6). Commerce's discussion consists of conclusory statements regarding HHI's 3,300 pages of sales documentation, without any examples or citations to support those statements. See id. at 27-28. As a result, the court cannot reasonably discern how HHI impeded the review because the court cannot determine which transactions were missing supporting documentation, and which particular information Commerce determined was missing when it concluded that HHI's submission was deficient.
For example, Commerce found that Hyundai "did not provide invoices for many expenses." Id. at 28. The only record evidence that the agency cited as support is Commerce's supplemental questionnaire dated October 7, 2016. See id. at 27-28 nn.140-41 (citing Oct. 7, 2016 Suppl. Questionnaire at 5-6). The questionnaire does not indicate that HHI failed to provide any invoices because it does not include HHI's responses or identify particular transactions that were not supported by invoices. Commerce also found "other discrepancies on the record" for which it provided no citations to the record or detailed discussion. See id. at 28. The Government cites generally to the extensive attachment and does not explain how the agency determined that the attachment indicates which invoices were missing or otherwise demonstrates discrepancies in HHI's data. See Def.'s Resp. at 30 (citing HHI's Nov. 10, 2016 Suppl. Resp., Attach. 3S-35).
ABB cites its own administrative case brief as record evidence supporting the agency's findings. ABB's Resp. at 42 & nn. 11-12 (citations omitted). However, the Issues and Decision Memorandum does not indicate that Commerce relied on ABB's administrative case brief to determine that there was missing documentation or that Commerce agreed with the discrepancies alleged therein. See I & D Mem. at 27-28 & nn.140-41. The court may not conclude that Commerce based its findings on ABB's administrative case brief when Commerce made no indication of such in the Issues and Decisions Memorandum. "Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court." NMB Singapore Ltd. , 557 F.3d at 1319.
Commerce's Issues and Decision Memorandum, by itself, does not constitute substantial evidence. In the absence of substantial evidence, this conclusion must be remanded. See Bowman Transp., Inc. v. Ark.-Best Freight System, Inc. , 419 U.S. 281, 285-86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) ("The agency must articulate a rational connection between the facts found and the choice made.") (internal quotation marks and citation omitted).
*1350 CONCLUSION
As previously noted, Commerce based its decision to use total facts available with an adverse inference on four findings: (1) HHI failed to report separately service-related revenues despite repeated requests from Commerce; (2) HHI failed to include the price of a subject part in the gross unit price of certain home-market sales; (3) HHI failed to report separately the price and costs of accessories; and (4) HHI selectively provided (and withheld) sales documents, and there were discrepancies in the reporting. The court has found that two of the four bases for resorting to total adverse facts available were unsupported by substantial evidence; therefore, the court will remand this matter to the agency so that Commerce may reconsider or further explain its decision to use total facts available with an adverse inference.[13]
In accordance with the foregoing, it is hereby
ORDERED that Commerce's Final Results are remanded to Commerce so that it may reconsider or further explain its use of total facts available with an adverse inference consistent with this Opinion;
ORDERED that Commerce shall file its remand results on or before November 13, 2018; and it is further
ORDERED that subsequent proceedings shall be governed by USCIT Rule 56.2(h) ; and it is further
ORDERED that any comments or responsive comments must not exceed 5,000 words.

The administrative record for this case is divided into a Public Administrative Record ("PR"), ECF No. 17-4, and a Confidential Administrative Record ("CR"), ECF No. 17-5. Parties submitted joint appendices containing record documents cited in their briefs. See Public J.A. ("PJA"), ECF No. 44 (Vols. I-III); Confidential J.A. ("CJA"), ECF Nos. 40-1 (Vol. I), 41-1 (Vol. II), 42-1 (Vol. III), 43-1 (Vol. IV), 45-1 (Vol. V), 46-1 (Vol. VI), 46-2 (Vol. VII). References are to the confidential versions of the relevant record documents, unless stated otherwise.

Commerce issued supplemental questionnaires to HHI both before and after it published the preliminary results. Further discussion of the supplemental questionnaires and HHI's responses to them is contained in the relevant section of the analysis, infra.

Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the United States Code are to the 2012 edition. Citations to 19 U.S.C. § 1677e, however, are to the United States Code 2016 edition, which reflects amendments to § 1677e pursuant to the Trade Preferences Extension Act ("TPEA"), Pub. L. No. 114-27, § 502, 129 Stat. 362, 383-84 (2015). The TPEA amendments affect all antidumping determinations made on or after August 6, 2015, and, therefore, apply to the instant proceeding. See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793 (Dep't Commerce Aug. 6, 2015).

Nippon Steel predates the amendments made to 19 U.S.C. § 1677e by the TPEA; however, the relevant statutory language discussed in that case remains unchanged. Compare 19 U.S.C. § 1677e(b)(2012), with 19 U.S.C. § 1677e(b)(1)(2016).

The sales were identified as U.S. sequence numbers ("SEQUs") 11 and 16. Oct. 7, 2016 Suppl. Questionnaire at 6. SEQU 11 concerned the issue of separately negotiated services, whereas SEQU 16 concerned the issue of non-subject merchandise. See Resp. to Questions 13 and 17 of the Third Suppl. Sections A, B, C, and D Questionnaire (Nov. 10, 2016) ("HHI's Nov. 10, 2016 Suppl. Resp.") at 7-8, CJA Vol. II Tab 17, CR 440-449, PJA Vol. I Tab 17, PR 241-250, ECF No. 41-1.

Transportation, offloading, and supervision. Id. at 7-8.

Attachment 3S-35 spans CJA Vol. II Tab 17 at JA 100538, ECF No. 41-1, to CJA Vol. IV Tab 17 at JA 103841, ECF No. 43-1.

While Commerce's instruction included an alternative by which HHI might explain why it chose not revise its database, this alternative did not excuse HHI from the reporting burden if Commerce did not accept the explanation and the alternative did not exclude the risk that Commerce would rely on facts available in the absence of time to make another request for the information. Plaintiff was required to prepare an "accurate and complete record in response to questions plainly asked by Commerce." Tung Mung Dev. Co., Ltd. v. United States , 25 CIT 752, 788-89 (2001) (citing Olympic Adhesives, Inc. v. United States , 899 F.2d 1565, 1571-72 (Fed. Cir. 1990) ).

Home market sequence numbers 84 and 91. July 27, 2016 Suppl. Questionnaire at 5.

HHI reported the local control panels for main transformers (MT), stand-by auxiliary transformers (SAT), and unit auxiliary transformers (UAT) as non-subject merchandise. See HHI's Aug. 18, 2016 Suppl. Resp., Attach. 2S-17 at JA100160, JA100165-JA100167 (referring to this part as "NSM").

The sales documentation included product price and detail for the part in question. See HHI's Aug. 18, 2016 Suppl. Resp., Attach 2S-17 at JA100164-JA100168.

Compare HHI's Nov. 10, 2016 Suppl. Resp., Attach. 3S-35 at JA100587-92, CJA Vol. II Tab 17, ECF No. 41-1 (listing "Transformer Monitoring," "On-line Dissolved Gas & Moisture Monitor," "Magnetic Liquid-Level Indicators," "Pressure-Relief Devices," "Rate-of-Rise Fault Pressure Relay," "Bladder Integrity Relay," "Dial-Type Top-Oil Thermometer," "Dial-Type Winding Thermometer," and "Transformer Nameplate" as "accessories"), with id. at JA 101002-09 (listing "Fault Gas Analyzer," "LAN Ethernet Switch," "Fiber Optic Temperature Monitoring/Control & Sensors," "Top Oil/Winding Temperature Instrument," "Thermometers," "Fan And Oil Pump Motors," "Oil Level Sight Glass," "Buchholz Relay," "Fault Pressure Relay," "Seal-In Relay," "Rupture Disk Assembly Failure Relay," "Auxiliary Relays," "Alarm Contacts," "Tap-Changer Operator," "Identification Plates," and "Valves" as "accessories").

At Oral Argument, Defendant and Defendant-Intervenor both suggested that any one or two of the bases cited by Commerce was sufficient to support the agency's decision to rely on total adverse facts available in the Final Results. See Oral Arg. Tr. at 15-20, ECF No. 51. While the court finds that two of the four bases are supported by substantial evidence, the court is unable to affirm the agency's resort to total adverse facts available because the agency made clear that its determination was based on its view of the record "taken as [a] whole." I & D Memo. at 17.